| | |
|---|---|
| DOME TECHNOLOGY, LLC, and<br>DOME TECHNOLOGY USA, INC.<br>    Plaintiffs,<br><br>v.<br><br>GOLDEN SANDS GENERAL<br>CONTRACTORS, INC., and<br>AMERICAN BUSINESS CONTINUITY<br>DOMES,<br>    Defendants. | No. 3:16-cv-01607 (VAB) |

**RULING ON DEFENDANTS' MOTION TO DISMISS AND COMPEL ARBITRATION**

Dome Technology, LLC, and Dome Technology USA, Inc., (together, "Plaintiffs" or "Dome Technology"), filed this lawsuit seeking to recover putative damages from a breach of contract and guarantee related to a construction project at a nuclear power facility in Waterford, Connecticut. Golden Sands General Contractors, Inc., ("Golden Sands"), and American Business Continuity Domes, ("ABC Domes") (together "Defendants"), filed this motion seeking to compel arbitration and either dismiss the case or stay proceedings.

For the reasons stated below, the Defendants' Motion to Compel will be **GRANTED** and the case will be **STAYED** pending arbitration.

**I    Factual and Procedural Background**

Plaintiffs, a limited liability company and a corporation, both based in Idaho, "specializ[e] in the construction of large-scale industrial bulk storage reinforced concrete domes." Am. Compl. ¶ 1, ECF No. 33. Defendants are a Florida corporation that specializes in

1

leasing concrete domes, ABC Domes, and a construction company offering general contracting services, Golden Sands. *Id.* at ¶ 2-3. Both Defendants allegedly share identical principals. *Id.* at ¶ 4.

In December 2012, the parties entered into an agreement to bid on, procure materials for, and construct a series of "business continuity and disaster dome projects." Am. Compl. ¶ 10. The domes were to be marketed to companies as protection for future natural disasters: a company might keep their computer servers, for instance, within the dome built by the parties and, in so doing, "allow the company's systems to remain operational during and after natural disasters." *Id.* at ¶ 11.

Several separate agreements allegedly governed the relationship between the parties, each maintaining that the parties would stay separate and distinct entities. *Id.* at ¶¶ 12-14. All four parties — Plaintiffs, Dome Technology USA, Inc., and Dome Technology LLC, and Defendants, American Business Continuity Domes, Inc., and Gold Sands General Contracts, Inc. — signed the Strategic Alliance Agreement ("SAA"), effective December 17, 2012.[1] *See* SAA at 6-7, Am. Compl., Ex. A, ECF No. 33-1.

The SAA laid out the responsibilities and obligations of the parties in undertaking "Cooperative Projects." ABC Domes undertook to "[f]acilitate a mutually acceptable project construction agreement between Golden Sands as general contract and Dome Technology as subcontractor . . . ." SAA at § 5.2. Additionally, they agreed that "ABC Domes guarantees Golden Sands' payment obligations to Dome Technology under any subcontract subject,

---

[1] The SAA provided that "While Golden Sands will not participate in the Cooperative Project agreements or Joint Business Development activities, Golden Sands wishes to enter into this Agreement for the purpose of binding itself to these terms in exchange for Golden Sands being designated by ABC Domes and Dome Technology as the preferred general contractor for the Cooperative Projects." SAA at § 3.I.

however, to Golden Sands' contractual rights of setoff, chargeback and other nonpayment defenses provided for in the subcontract." SAA at § 7.1. Dome Technology committed to provide construction services, market the services of the parties, and maintain liability insurance. SAA at § 5.1. All parties were required to "[a]gree with Golden Sands upon a standard set of construction general terms and conditions to be included in any general construction contract between Golden Sands and project customers and in the corresponding subcontract between Golden Sands and Dome Technology." SAA at § 5.3.

The SAA also contained a dispute resolution section. SAA at § 14.4. The SAA provided that the parties would first try to resolve any disputes through non-binding mediation. *Id.* Disputes not resolved by mediation would proceed to arbitration:

> Any dispute, claim, or controversy arising solely between the Parties out of or relating to any interpretation, construction, performance or breach of this Agreement (including both actions in contract and in tort) arising out of or relating to the enforcement of this Agreement (relief (including damages, rescission, specific performance, injunction, and punitive damages) that is not resolved by nonbinding mediation shall be settled exclusively by arbitration.

*Id.* The SAA required that those proceedings occur in a mutually agreeable location, or in Orlando, Florida, if the parties could not agree on a location, and proceedings had to begin within one year after the claim arose. *Id.* Additionally, "[j]udgment whether in damages or injunction or otherwise may be entered on the arbitrator's decision in any court having competent jurisdiction, the same as if the arbitration decision had originally been rendered by that court." *Id.*

The SAA stated that it "shall remain intact for fifteen (15) years, then the Parties will review and assess the results" and seek to continue the agreement. SAA at § 14.3. The agreement could be modified or terminated, "providing all Parties agree to such modifications or terminations." *Id.*

3

As contemplated in the SAA, Dome Technology and Golden Sands then entered into their own Master Subcontract Agreement ("MSA"). MSA, Am. Compl., Ex. B, ECF No. 33-2. The MSA governed the work and terms for both parties. The agreement stated that, by its terms, "[t]his agreement supersedes all prior agreements, written or oral, between Golden Sands and either Subcontractor relating to the subject matter of this agreement." MSA at 1. The MSA also contained a section on choice of law and jurisdiction related to disputes about the MSA. It stated:

> 10. LEGAL NOTICES AND DISPUTES. in order to avoid conflicts of law, if a dispute arises out of either Party's performance under a Subcontract Agreement, then the validity, interpretation and performance of this Agreement shall be governed by the Laws of the State in which the corresponding Subcontract-Agreement project is located. In the absence of a disputed Subcontract Agreement as provided above, the validity, interpretation, and performance of this Agreement, standing alone, shall be governed by the Laws of the State of Florida and in such case only any judicial proceeding shall be brought in the County of Miami-Dade, Florida within two (2) years of the date the cause of action accrued, but in no event after final payment to the Subcontractor. Subcontractor agrees to participate in and be bound by any proceedings which directly or indirectly relates to this Agreement (litigation, arbitration and/or mediation). No dispute or controversy shall interfere with the progress of the construction and Subcontractor shall proceed with the work without causing interruption, deficiency or delay. Notwithstanding anything in the foregoing to the contrary, the exclusive legal jurisdiction as well as the validity, interpretation, and performance under any Subcontract Agreement shall be in the appropriate courts of and governed by the Laws of the State where the project that is the subject of the Subcontract Agreement is located.

MSA at § 10.

Following the Fukushima nuclear power plant failure in Japan, Dome Technology alleges that its owner presented at a nuclear conference in Virginia. Am. Compl. ¶ 25-26. The presentation allegedly gave rise to several contracts to build domes for nuclear power stations throughout the United States. *Id.* at 27-28. One of these contracts was awarded for the Millstone Nuclear Power Plant in Waterford, Connecticut. *Id.* at 30. *See also* Subcontract, Am. Compl., Ex. C, ECF No. 33-4.

Dome Technology alleges that ABC Domes and Golden Sands entered into the contract with the power plant as a joint venture. *Id.* at ¶ 33. Golden Sands and Dome Technologies entered into a subcontract agreement as required by the MSA, and Dome Technologies alleges they began working on the project. *Id.* at ¶¶ 37-38. Dome Technologies then alleges that, "[a]t some point during the construction process, Golden Sand requested that Dome Technology assign certain portions of Dome Technology's scope of work on the Millstone Project over to Golden Sands." *Id.* at 39. Dome Technology further alleges that they completed all their obligations under the subcontract, but Golden Sands failed to pay them fully for the work and materials provided. *Id.* at ¶¶ 43, 46-49.

Plaintiffs then filed this lawsuit, alleging that Golden Sands had breached the MSA and the Millstone Project subcontract and that Golden Sands owed them $365,990.91. *Id*. at ¶¶ 54-60. Plaintiffs further allege that ABC Domes breached its obligations to guarantee Golden Sands's payment obligation under the SSA. *Id.* at ¶¶ 61-67. Finally, they allege violations of Connecticut law, *id.* at ¶¶ 68-74, and that ABC Domes is also liable because they allege that ABC Domes and Golden Sands had entered into a joint venture together. *Id.* at ¶¶ 75-88.

This case, however, is not the only pending dispute involving the parties. Dome Technology filed three other similar actions addressing other nuclear dome facilities in Texas, Virginia and Georgia. *See* Pls. Opp. Br. 9-10, ECF No. 34. Parties report that the cases in Texas and Georgia settled on March 10, 2017 and were dismissed. *Id.* In the Virginia case, the court granted Defendants' Motion to Compel Arbitration. *See Dome Technology, LLC v. Golden Sands General. Contractors, Inc.*, No. 3:16-cv-00069, 2017 WL 2799619 (W.D. Va. June 28, 2017).

Defendants also jointly filed an arbitration demand against Dome Technology on September 1, 2016.[2] The demand alleged that Dome Technology had breached the SAA in various ways and eventually "unilaterally, and improperly" terminated the agreement. Arbitration Demand at ¶ 3, Defendants sought monetary damages and declaratory relief. *Id.* at ¶ 11. Dome Technology responded with a counterclaim: while maintaining that arbitration was the wrong forum,[3] they included the Millstone subcontract and Defendants' failure to pay in their counterclaim as a breach of the SAA. *See* Pls. Answer and Countercl. ¶¶ 118-137, Pls. Opp. Br., Ex. 2. The arbitration counterclaim alleges the same amount of damages. *Compare Id.* at ¶ 127 (alleging Golden Sands owes $385,990.91 on the Millstone Project) *with* Amend. Compl. at ¶ 59 (same).

Defendants now move to dismiss the Amended Complaint or, alternatively, seek to have the Court compel these claims to be heard in the already-pending arbitration proceedings. Defs. Mot. to Dismiss and Compel Arbitration, ECF No. 36.

## II. Standard of Review

The Federal Arbitration Act provides that "[a] written provision in . . . a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter

---

[2] Plaintiffs initiated this lawsuit on September 23, 2016. *See* Compl., ECF No. 1. They subsequently amended the complaint on March 6, 2017. *See* Am. Compl.

[3] The counterclaim at issue included the following: "Dome Technology does not believe this arbitration is the proper forum to adjudicate the recovery of funds owed under subcontract agreements, as jurisdiction is established in the location where each project is performed. Dome Technology has or will initiate proceedings to recover these funds in each jurisdiction where the Domes were built. Dome Technology has included this claim in these proceedings merely to preserve its right to recover such funds should any of the courts in which suit is filed find jurisdiction properly rests in this arbitration and dismiss the litigation proceedings. Dome Technology does not intend to pursue its monetary damages claims in this arbitration." *See* Pls. Answer and Countercl. ¶¶ 316 & n.2, Pls. Opp. Br., Ex. 2. The parties subsequently amended their proceedings in the arbitration. *See* Defs. Notice of Suppl. Authority, ECF No. 43.

arising out of such contract or transaction . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. As the Second Circuit has noted, "[t]he FAA creates a 'body of federal substantive law of arbitrability, applicable to any arbitration agreement within the coverage of the Act." *In re American Express Financial Advisors Sec. Litig.*, 672 F.3d 113, 127 (2d Cir. 2011) (*quoting Moses H. Cone Memorial Hosp. v. Mercury Construction Corp.*, 460 U.S. 1, 24 (1983)). The Act "establishes a national policy favoring arbitration when the parties contract for that mode of dispute resolution" and "calls for the application, in state as well as federal courts, of federal substantive law regarding arbitration." *Id.* at 128.

Courts in the Second Circuit have two primary tasks when determining if the case should be arbitrated. *In re American Express*, 672 F.3d at 128. First, courts must determine "whether the parties have entered into a valid agreement to arbitrate . . . ." *Id.* at 128. If the answer is yes, courts then must determine whether the dispute at issue comes within the scope of the arbitration agreement. *Id.*

In determining whether a particular claim is within the scope, courts must further examine whether the arbitration provision is broad or narrow. *WorldCrisa Corp. v. Armstrong*, 129 F.3d 71, 74-75 (2d Cir. 1997). "[T]he existence of a broad agreement to arbitrate creates a presumption of arbitrability which is only overcome if 'it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage.'" *Id.* (*quoting Associated Brick Mason Contractors of Greater New York, Inc. v. Harrington*, 820 F.2d 31, 35 (2d Cir.1987)); *see also Applied Energetics, Inc. v. NewOak Capital Markets, LLC*, 645 F.3d 522, 526 (2d Cir.2011) ("In other words, while doubts concerning the scope of an arbitration clause should be resolved in

7

favor of arbitration, the presumption does not apply to disputes concerning whether an agreement to arbitrate has been made.").

When parties are compelled to arbitrate the underlying issues, in the Second Circuit, district courts are required to stay, rather than dismiss, proceedings. *See Katz v. Cellco Partnership*, 794 F.3d 341, 345 (2d Cir. 2015) ("We join those Circuits that consider a stay of proceedings necessary after all claims have been referred to arbitration and a stay requested.").

## III. DISCUSSION

The primary dispute in this case is whether the parties agreed to arbitrate these claims. Defendants argue that the Strategic Alliance Agreement and its dispute resolution procedures control and that the SAA is the "only document arguably containing any obligation for ABC Domes to pay Dome Technology." Defs. Mem. in Supp. at 3, ECF No. 37. Plaintiffs argue instead that the "only issues to be resolved are the obligations of Golden Sands, which are governed exclusively by the MSA." Pls. Opp. Br. at 1. They argue that the MSA superseded the arbitration clause in the SAA and that the MSA's forum selection clause, and its silence regarding arbitration, can be read to provide exclusive jurisdiction to this Court.

The Court agrees with Defendants. The MSA does not conflict with the SAA and, therefore, the parties have agreed to arbitrate claims that fall within the scope of that agreement. Furthermore, these claims arise out of the relationships between the parties, structured by the SAA. Therefore, arbitration is appropriate and the Court will stay this case pending arbitration of Plaintiffs' claims.

### A. The MSA's Forum Selection Clause and the SAA's Arbitration Provision

The Second Circuit has held that a subsequent agreement between two parties that includes a forum selection clause may override a prior arbitration clause. *Goldman, Sachs & Co.*

*v. Golden Empire Schs. Fin. Auth.*, 764 F.3d 210, 215 (2d Cir. 2014). In determining whether an agreement to arbitrate is superseded by a "later-executed agreement containing a forum selection clause," the court must determine "if the clause 'specifically precludes' arbitration." *Id.* (*quoting Bank Julius Baer & Co. v. Waxfield Ltd.*, 424 F.3d 278, 284 (2d Cir. 2005)). There is no requirement that the forum clause explicitly mention arbitration. *Applied Energetics, Inc. v. NewOak Capital Markets, LLC*, 645 F.3d 522, 526 (2d Cir. 2011).

Courts in the Second Circuit have continued to enforce arbitration agreements where the agreement and a subsequent forum selection clause could be read as complementary. *See Bank Julius*, 424 F.3d at 284-285, *abrogated on other grounds by Granite Rock Co. v. International Brotherhood of Teamsters*, 561 U.S. 287 (2010); *see also Offshore Exploration and Production, LLC. V. Morgan Stanley Private Bank*, 626 F. App'x. 303, 307 ("Here, the forum selection clause is not all-inclusive or mandatory, and it should therefore be read as complementary; the parties merely consented to the jurisdiction of courts in New York for those disputes" under the second agreement "that they did not agree to arbitrate under the" first); *Palese v. Tanner Bolt & Nut, Inc.*, 985 F. Supp. 2d 372 (E.D.N.Y. 2013) (adopting *Bank Julius*'s logic and holding that forum selection clause did not vitiate arbitration provision in prior agreement).

In *Bank Julius,* the parties argued first that the merger clause in the subsequent agreement superseded all prior agreements between the parties. 424 F.3d at 283. The Court rejected that argument, and held that the merger clause superseded "any previous agreements only to the extent that they conflict." *Id.* The Court then turned to the forum selection clause.[4] The Court

---

[4] The forum selection clause at issue required that, while the defendant could bring suit in other jurisdictions, the plaintiff "irrevocably submits to the jurisdiction of any New York State or Federal court sitting in New York City, and . . . hereby irrevocably agrees that any Action may be heard and determined in such New York State court or in such Federal court." *Id.* at 282.

9

reasoned that the clause "may be read, consistent with the Arbitration Agreement, in such a way that the Bank and Waxfield are required to arbitrate their disputes, but that to the extent the Bank files a suit in court in New York — for example, to enforce an arbitral award, or to challenge the validity or application of the arbitration agreement — Waxfield will not challenge either jurisdiction or venue." *Id.* at 285. The two provisions did not conflict, and the forum selection clause did not overrule the arbitration requirement.

In contrast, the Second Circuit held in *Applied Energetics* and *Goldman, Sachs* that a forum selection clause did override a prior arbitration agreement in cases where the superseding clause was "all-inclusive and mandatory." *Goldman, Sachs*, 764 F.3d at 215-16 (comparing *Bank Julius* and *Applied Energetics*, and noting "Unlike the clause in *Bank Julius*, which simply waived objection to jurisdiction in New York, the clause here is all-inclusive and mandatory."). The superseding agreements at issue in *Applied Energetics* and *Goldman, Sachs* each had broader merger clauses than the agreements in *Bank Julius*. *Goldman, Sachs*, 764 F.3d at 216. Additionally, the forum selection clauses were not permissive but mandatory. *Id.* at 212 (quoting forum selection clause language as requiring that "all actions and proceedings arising out [of the superseding agreement] hereby shall be brought" in district court). Finally, the language was all-inclusive: "all actions and proceedings" included both court proceedings and arbitration. *Id.* at 216-17; *see also Applied Energetics*, 645 F.3d at 525 (holding that clause that required that "[a]ny dispute . . . shall be adjudicated" was all-inclusive and conflicted with arbitration provision in previous agreement).

Dome Technology relies on *Applied Energetics* and *Goldman, Sachs* to argue that the MSA's forum selection clause is all-inclusive and mandatory and therefore supersedes the SAA's prior arbitration provision. Pl. Opp. Br. at 21-22. They rely on two sections of the MSA.

10

First, that the MSA "supersedes all prior agreements, written or oral, between Golden Sands and either Subcontractor relating to the subject matter of this Agreement." Pls. Opp. Br. at 18 (quoting the MSA's Recitals). They primarily rely, however, on the forum selection clause, which states that:

> Notwithstanding anything in the foregoing to the contrary, the exclusive legal jurisdiction as well as the validity, interpretation, and performance under any Subcontract Agreement shall be in the appropriate courts of and governed by the Laws of the State where the project that is the subject of the Subcontract Agreement is located.

MSA at ¶ 10. They argue that the MSA sets up a dispute resolution system that varies depending on whether there is a subcontract agreement. Pl. Opp. Br. at 24. Where there is a subcontract agreement — as they argue is the case here — the applicable provision of the forum selection clause is implicated and therefore supersedes any prior arbitration agreement. *Id.* at 24.

This case, however, differs in important ways from the disputes at issue in *Applied Energetics* and *Goldman, Sachs*. First, both of those cases involved contracts where all parties to the prior agreement were parties to the superseding agreement. *See Goldman Sachs*, 764 F.3d at 211 (describing broker-dealer contracts between two sets of parties); *Applied Energetics*, 645 F.3d at 523 (describing how Applied and NewOak were parties to an initial agreement that "specifically contemplated that the parties would enter into a subsequent, more formal agreement," and that they both then signed a subsequent agreement). That is not the case here. As Defendants point out, ABC Domes is not a party to the MSA. Def. Rep. Br. at 3, ECF No. 41. It is difficult to see how such an incomplete set of parties — even assuming they have the same principals and legal representation, but have maintained their independence — would be able to supersede a broader, prior agreement, especially where the relationship between the parties is structured by that prior agreement. *Cf. Narragansett Elec. Co. v. American. Home Assurance Co.,* No. 11-civ-8299 (PKC), 2012 WL 4075171, at *8 (S.D.N.Y. Sept. 12, 2012) ("Under U.S.

11

law, a 'novation requires the consent of all parties to substitute one obligation or agreement for another.'") (*quoting Raymond v. Marks*, 116 F.3d 466, 466 (2d Cir.1997)).

Second, the language of the forum selection clause in this case is far less sweeping than the ones at issue in *Applied Energetics* and *Goldman, Sachs*. At oral argument, Plaintiffs' counsel argued that *Applied Energetics* and *Goldman, Sachs* addressed the specific language of the contract at issue in this case. But the jurisdiction clauses in those cases extended to "[a]ny dispute" or "all actions and proceedings." *Goldman, Sachs*, 764 F.3d at 216-17 (describing this forum selection clause language as mandatory and all-inclusive); *see also Applied Energetics*, 645 F.3d at 523 (same). Here, however, the relevant provision provides only "exclusive legal jurisdiction" to this Court. MSA at ¶ 10. It is unclear whether "exclusive legal jurisdiction" would include arbitration, a form of alternative dispute resolution. *See Dome Technology, LLC v. Golden Sands General. Contractors, Inc.*, No. 3:16-cv-00069, 2017 WL 2799619, at *6 (W.D. Va. June 28, 2017) (collecting cases and deciding, in parallel proceeding to this one, that arbitration does not conflict with "exclusive legal jurisdiction" provision).[5] And, at a minimum,

---

[5] At oral argument, counsel for Dome Technology also argued that a parallel decision in the Western District of Virginia was not persuasive because the law of the Second and Fourth Circuits diverged with respect to whether a superseding forum selection clause must explicitly mention arbitration. *Compare UBS Financial Services., Inc. v. Carilion Clinic*, 706 F.3d 319, 329 (4th Cir. 2013) ("[O]ne would reasonably expect that a clause designed to supersede, displace, or waive arbitration would mention arbitration") *with Goldman, Sachs*, 764 F.3d at 217 ("The Fourth Circuit also 'expect[ed] that a clause designed to supersede, displace, or waive arbitration would mention arbitration,' *Carilion Clinic*, 706 F.3d at 329, but that is not the law of this Circuit . . . ."). While the Western District did cite to the Fourth Circuit's decision in *Carillion*, it also relied heavily on Second Circuit law to conclude that the SAA's arbitration provisions and the MSA's forum selection clause were complementary and that similar claims were within the scope of the SAA's arbitration clause. *See Dome Technology*, 2017 WL 2799619 at *7 (citing *Bank Julius* and *Applied Energetics* to conclude that "this is not a case in which the arbitration clause in one agreement cannot be reconciled with the forum selection clause in another). This Court therefore considers the decision in the Western District of Virginia to be of value.

the clause at issue in this case would not bring within its reach "any dispute" between the parties, or "all actions or proceedings," but rather a subset of the claims that might arise.

As a result, the forum selection clause from the MSA is not incompatible with the arbitration provision in the SAA. They are "complementary" and therefore the MSA does not stand as a barrier to arbitration, if the claims at issue in this case fall within the scope of the arbitration provision.

### B. The Scope of the Arbitration Clause

Once it is determined that the parties have agreed to arbitrate, the Court must further determine whether "the dispute at issue comes within the scope of the arbitration agreement." *In Re American Express*, 872 F.3d at 128. The question turns on whether the arbitration clause is broad or not. *Louis Dreyfus Negoce S.A. v. Blystad Shipping & Trading Inc.*, 252 F.3d 218, 225 (2d Cir. 2001). A broad arbitration clause gives rise to the presumption that even collateral matters will come within its scope. *Id.* ("When parties use expansive language in drafting an arbitration clause, presumably they intend all issues that touch matters within the main agreement to be arbitrated, while the intended scope of a narrow arbitration clause is obviously more limited.") (internal citations and quotations omitted); *JLM Industries, Inc. v. Stolt-Nielsen SA*, 387 F.3d 163, 172 (2d Cir. 2004) (noting extension of broad arbitration clauses to claims that "touch matters" or are "collateral" to the agreement).

The relevant clause here does contain broad language:

> Any dispute, claim, or controversy arising solely between the Parties out of or relating to any interpretation, construction, performance or breach of this Agreement (including both actions in contract and in tort) arising out of or relating to the enforcement of this Agreement, (including the formation, performance, modification or extension of this agreement) or any form of relief (including damages, rescission, specific performance, injunction, and punitive damages) that is not resolved by nonbinding mediation shall be settled exclusively by arbitration.

SAA at § 14.4. The Second Circuit has repeatedly recognized such language as broad and, therefore, requiring collateral matters to be arbitrated. *See, e.g. JLM Industries*, 387 F.3d at 172 (holding arbitration clause that required that "[a]ny and all differences and disputes of whatsoever nature arising out of this Charter" be subject to arbitration qualified as a broad arbitration clause); *Paramedics Electromedicina Comercial, Ltd. v. GE Med. Sys. Info. Techs., Inc.*, 369 F.3d 645, 654 (2d Cir. 2004) (declaring a clause as broad that covered "any controversy, claim or dispute" arising from agreement); *see also Doctor's Associates, Inc. v. Quinn*, 42 F. Supp. 2d 184, 186 (D. Conn. 1999) ("The clause at issue here, submitting to arbitration 'any controversy or claim arising out of or relating to this Agreement or the breach thereof,' is a broad arbitration clause.").

Plaintiffs argue that the underlying case arises not from the SAA, but from the MSA and the subcontracts between Dome Technology and Golden Sands. But, the MSA itself is a product of the SAA's requirement that ABC Domes would "[f]acilitate a mutually acceptable project construction agreement between Golden Sands as general contract and Dome Technology as subcontractor . . . ." SAA at § 5.2. In any event, the SAA is the only agreement in which all parties — Dome Technology, Golden Sands, and ABC Domes — are signatories. *Cf. Robinson Brog Leinwand Greene Genovese & Gluck v. John M. O'Quinn & Assoc.*, 523 F. App'x 761, 763 (2d Cir. 2013) ("Robinson Brog may not seek to benefit from the portion of the Client Agreement that creates the pool of funds for payment of attorneys' fees without also subjecting itself to the arbitration clause contained in that same agreement" by citing a second agreement). The relationship between the parties is expressed through the SAA, as would be any requirement that ABC Domes serve as guarantee for Golden Sand's debts. Dome Technology, indeed, refers to the SAA in the Amended Complaint extensively.

14

These claims therefore come within the broad sweep of the SAA's arbitration provision. As a result, this case will be compelled to arbitration and proceedings before this Court will be stayed, rather than dismissed, while that arbitration continues. *Katz*, 794 F.3d at 345 (requiring stay when court compels all claims to arbitration.)

## CONCLUSION

For the reasons stated above, Defendants' Motion to Compel is **GRANTED** and proceedings before this Court will be **STAYED** until the arbitration is resolved.

SO ORDERED at Bridgeport, Connecticut this 3rd day of November, 2017.

/s/ Victor A. Bolden

VICTOR A. BOLDEN
UNITED STATES DISTRICT
JUDGE